UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Nicola Michelle Byrd, | ) | C/A No. 5:22-336-KDW |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | ORDER |
| Kilolo Kijakazi, Acting Commissioner of | ) | |
| Social Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| _____ | ) | |

This social security matter is before the court pursuant to 28 U.S.C. § 636(c) and Local

Civil Rule 83.VII.02 (D.S.C.) for final adjudication, with the consent of the parties, of Plaintiff's

petition for judicial review. Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) to obtain

judicial review of a final decision the Commissioner of Social Security ("Commissioner"), denying

her claim for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI")

pursuant to the Social Security Act ("the Act"). Having carefully considered the parties'

submissions and the applicable law, the court affirms the Commissioner's decision for the reasons

discussed herein.

I.   Relevant Background

   A.   Procedural History

   On August 6, 2019,[1] Plaintiff protectively applied for DIB and SSI under Title II and Title

XVI of the Act. Tr. 262-74. She alleged a disability onset date of August 30, 2017. Tr. 262.

Plaintiff's applications were denied initially, Tr. 117-18, and upon reconsideration, Tr. 175-76,

and Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"), Tr. 196-97. The

---

[1] Although the Application Summaries are dated September 3, 2019, as noted in the Disability
Determination and Transmittals, Plaintiff's protected filing date is August 6, 2019. Tr. 117-18.

administrative hearing was held on March 8, 2021 before ALJ Nicholas Walter, Tr. 34-74, and on May 13, 2021, the ALJ issued an unfavorable decision, finding Plaintiff not disabled within the meaning of the Act, Tr. 12-27. Plaintiff requested review of the ALJ's decision, Tr. 256-58, and on December 8, 2021, the Appeals Council denied Plaintiff's request for review, Tr. 1-5. Thus, the ALJ's decision became final decision of the Commissioner. Tr. 1. Plaintiff brought this action seeking judicial review of the Commissioner's decision in a Complaint filed on February 3, 2022. ECF No. 1.

B.    Plaintiff's Background

Plaintiff was born July 23, 1975 and was 42 years old as of her alleged onset date of August 30, 2017. Tr. 324. In her September 3, 2019 form Disability Report-Adult, Plaintiff indicated that she completed the ninth grade, did not attend special education classes, and had not completed any type of specialized job training, trade or vocational school. Tr. 329. She noted her past relevant work ("PRW") included ambulance service wheelchair transporter (July 2002-July 2005) and nursing home resident care (August 2006 – August 30, 2017). *Id.* Plaintiff indicated that she stopped working on August 30, 2017 because of her conditions which she listed as slipped disc neck, back pain due to injury, nerve damage in leg, osteoarthritis in back, and numbness in left leg. Tr. 328. Plaintiff indicated that she is 5'6" tall, weighed 248 pounds, and her conditions caused her pain or other symptoms. *Id.*

In a Disability Report-Appeal dated February 14, 2020, Plaintiff indicated that her medical condition had changed in December 2018. Tr. 359. She described those changes as follows:

> I started realizing that my back injury was not getting better and I started withdrawing from my kids, husband, friends and things only got worse. I started having panic attacks, yelling for no real reason at family and I stopped going to church and just wanted to be in my bed. I couldn't remember my age getting los[t] going home. I was in a dark place. Calling for help and no one came.

*Id.* Plaintiff indicated new medical conditions that occurred from December 17, 2019 to December

2

23, 2019 of "[s]evere recurrent major depression with psychotic features, mood – congruent, Panic

disorder, Chronic pain syndrome, Chronic pain in left knee." *Id.*

In a subsequent Disability Report-Appeal dated September 17, 2020, Plaintiff indicated a

"continuous" change in her medical conditions. Tr. 398. Plaintiff described the changes as follows:

> My conditions are worse. Last MRI did show my symptoms. Talked with surgeon
> and surgery wouldn't fix back issue. My right ha[n]d is very very painful. I will
> have a visit with Hand center soon. I have right handed arthritis, they will do some
> other tests. Arthritis in back has gotten worse on my right side. Pain in legs to the
> foot. Cortisone shots in left knee. Left side still have issues where leg is getting
> numb, sharp pain runs from back of leg to big toe and other toe numb. Trying to
> vacuum or mop with twisting or sudden movement spikes the pain level. Arthritis
> has gotten worse.

*Id.* Plaintiff also described changes to her activities including being able to prepare only small

meals once a week, and the inability to do much with her hand such as cooking or taking a shower.

Tr. 405. Plaintiff noted that she sometimes does not leave the house until she has a doctor's

appointment, and she is lying down more to ease the pain. *Id.* She also noted that she is "having to

have a lot of help with [her] children" and she can only handle taking care of them. *Id.*

C.     The Administrative Proceedings

Plaintiff appeared, along with her attorney, for her administrative hearing on March 8,

2021, in Greenville, South Carolina. Tr. 34. Vocational expert ("VE") Jacquelyn Schabacker also

appeared. *Id.* Due to the extraordinary circumstances of the coronavirus pandemic the hearing was

conducted telephonically. Tr. 36.

1.     Plaintiff's Testimony

In response to questions from the ALJ Plaintiff confirmed her birthdate and testified that

she is 5'6" tall and weighed 248 pounds. Tr. 42. Plaintiff stated that in the last five or six months

she had gained 30 pounds because of stress eating and medications that increased her appetite. *Id.*

Plaintiff could not recall the name of the medication but stated it was prescribed by Dr. Diak for

anxiety. Tr. 42-43. Plaintiff confirmed her home address and testified that she lived in the apartment with her two children ages 7 and 14. Tr. 43. Plaintiff stated that she had been separated from the children's father for over three years. *Id.* Plaintiff testified that she completed the ninth grade and "tried to get [her] GED, but that didn't work out for [her]." Tr. 43-44.

The ALJ questioned Plaintiff about her past work experience, starting with 2006 working for Sunrise Senior Living. Tr. 44. Plaintiff testified that was an assisted living facility and she helped residents with "[b]athing, dressing, light housekeeping, helping assist to the restroom and upstairs and downstairs to activities and dinner and breakfast – lunch and breakfast." *Id.* Plaintiff stated that lifting the residents was heavy and lifting trays in the dining room "could get really heavy also." Tr. 45. Plaintiff testified that she started working for Sunrise in 2006, then in 2012/2013 she went on early maternity leave, and when she returned the company was called Emeritus, and then changed to Brookdale. *Id.* Plaintiff stated that her entire work history was at the same place. *Id.* Plaintiff testified that she has not done any work for pay since August 30, 2017, and she had back surgery in August 2017. Tr. 46. Plaintiff stated that when she hurt her back she was doing two different jobs at the facility—during the week she worked in housekeeping, and she worked as a resident caregiver every other weekend. *Id.* Plaintiff testified that after her back surgery the company offered her a position in housekeeping, but because of all the bending associated with that position she did not return to work. *Id.* Plaintiff testified with the housekeeping portion of the job she "had to be able to lift anything from 25 pounds up." Tr. 47.

When asked what is preventing her from returning to work Plaintiff testified that she has lower back pain that is affecting her hips. Tr. 48. She stated that standing straight without leaning over on something puts pressure and pain in her lower back and that her hips "bother" her when walking. *Id.* Plaintiff stated that she has been "having some falling episodes" and her left knee has been giving her trouble for "a little over a year now." *Id.* Plaintiff stated that she has been getting

injections in her knee, but it will do a "quick popping thing" and cause her to get off balance and fall. *Id.* Plaintiff stated that she was walking from her apartment to her car and fell in the road, sprained her left ankle, and "messed up some tendons in [her] right big toe." *Id.* Plaintiff also confirmed that she is still having mental health concerns that make it hard for her to work. Tr. 49. Plaintiff confirmed that her right hip was giving her trouble and her left knee was bothering her. Tr. 50. Plaintiff testified that she could stand for five-to-six minutes in one spot before her back starts hurting and she will sit down. *Id.* Plaintiff stated that the pain goes from the middle of her back down to her buttocks—primarily on the right side. Tr. 50-51. Plaintiff affirmed that she has problems with walking and after five minutes of walking she would need to stop and take a break. Tr. 51. Plaintiff testified that she does not sit in one position too long before needing to shift her weight or move around to take pressure off her back. She stated that if she sits for periods of time her legs go numb down to her toes. *Id.* Plaintiff stated she can sit for 15-to-20 minutes before experiencing leg and lower back pain that causes her to get up. Tr. 52. She stated her left leg is worse than her right leg, but her right hip and side have "started to flare up more in the last few years—year or so." *Id.* Plaintiff referenced a recent MRI done in January which indicated a cyst that has increased and "some narrowing going on" since her last MRI. *Id.* Plaintiff testified that she can comfortably lift and carry five pounds and over five pounds she experiences cramping and tightness in her back. Tr. 52-53.

Plaintiff described a typical day as waking up, doing some stretches, getting her children up for virtual school, having a light breakfast so she can take her medications, and tidying up the bedrooms and bathrooms. Tr. 53. Plaintiff testified that most of the household chores are done by her children, including an older daughter who comes by daily after work to help with cleaning and cooking. Tr. 53-54. Plaintiff testified that she is most comfortable sitting with her legs elevated and a heating pad on her back. Tr. 54. She stated that she spends 70% of her day like that. *Id.*

Plaintiff stated that she meets with her counselor, Ms. Duncan, every two weeks. Tr. 55. Plaintiff testified that she still experiences anxiety and panic attacks. *Id.* She stated that with a panic attack she gets lightheaded, has a sharp pain in her chest that goes up to her throat, and the pain continues "back to back to back for, like, anywhere from five to ten minutes[,]" and then she feels completely drained. Tr. 56. Plaintiff testified that she normally has them twice a day on a daily basis. *Id.* Plaintiff stated that the panic attacks are triggered by her pain and by sometimes by her children squabbling—especially because they are at home due to the pandemic. Tr. 56-57.

In response to her attorney, Plaintiff testified that it is hard for her focus and through counseling she has realized that lack of concentration was always part of her life. However, she stated that it is worse with her anxiety and increased pain level. Tr. 58. Plaintiff stated that she started going to the bariatric clinic to try to lose weight and she lost 10-to-15 pounds. *Id.* Plaintiff affirmed that she began getting abscesses on her buttocks from the injections she was receiving and had to be admitted to the emergency room with a sepsis infection the first time, and then had to have surgery for the second abscess. Tr. 59. Plaintiff affirmed that she does not want to receive any more injections due to fear of abscesses. *Id.* Plaintiff testified that she has been using a cane since December when she started falling. Tr. 60. The cane was not prescribed, but Plaintiff told her doctors she was using it and they agreed with her using it for safety. *Id.* Plaintiff testified that after she fell and hurt her ankle she used crutches, a brace on her left ankle, and a boot on her right foot. *Id.* Plaintiff stated that she uses the ankle brace two or three times a week when her left ankle swells. Tr. 61. She stated that to relieve swelling she also has to elevate her foot to waist level, and alternate ice and heat. *Id.* Plaintiff testified that she sits in the recliner with her leg elevated to take pressure off her lower back and she alternates using the heating pad on her back, left knee, and hip. *Id.* Plaintiff stated she has been getting injections in her hands because of arthritis, her right thumb "drops a lot," and she has swelling in both hands. Tr. 61-62. Plaintiff testified that she has

problems gripping items, writing, or doing anything that applies pressure to her hands such as brushing her daughter's hair. Tr. 62. Plaintiff stated that the injections help a little but they are "very painful." *Id.* She stated that she uses "a lot of heat and ointments, ice, with [her] hands." *Id.*

Plaintiff confirmed that in 2020 she had an MRI of her left knee which indicated some swelling. Tr. 62-63. Plaintiff testified that she still has problems with swelling in her left knee, and her knee swells "maybe twice a week sometimes, just depending. It'll just flare up." Tr. 63. She stated that it swells the most when she is trying to be active or trying to stand and that is one of the reasons that she elevates her legs. *Id.* Plaintiff confirmed that is the knee for which she uses the heating pad and ice. *Id.* She testified that she uses ice on her left knee three times a week, and that is the knee that "pops and gives way[.]" Tr. 64. Plaintiff testified that she grocery shops with her son and her 26-year-old daughter and her children do the loading and unloading of groceries. *Id.* Plaintiff testified that she drives herself to her doctors' appointments "depending on how far and how bad [her] pain is on that day" and she sometimes drives to the store. Tr. 65. She stated that if she does not drive then her mother or daughter will take her to the doctor. *Id.* Plaintiff stated her mother brought her to the hearing. *Id.* Counsel asked if she was socializing and Plaintiff stated that in the last year she has been talking on the phone with her friends more than before. *Id.*

Plaintiff testified regarding her physical health condition following her surgery noting that three weeks after surgery and physical therapy she was still having pain. Tr. 66. She stated that her doctors told her she should start feeling relief in about a year, but instead she started having more issues with her hips and knees. *Id.* Plaintiff stated it affected her mentally as well. *Id.* She stated that with having the falling episodes it has been hard getting in and out of the shower and she is afraid she is going to fall; she noted she fell in the shower a few weeks earlier. Tr. 66-67. Plaintiff testified that the issue with her legs is "making [her] anxiety even worse, because [she] never know[s] when it's going to come on." Tr. 67. Plaintiff testified that at present she was not having

any side effects from her medications, but she was having problems with weight gain and not sleeping. *Id.* Plaintiff affirmed that her medications made her sleepy but she did not nap too often during the day. *Id.*

      2.    VE's Testimony

VE Schabacker testified at Plaintiff's administrative hearing. Tr. 68. She described Plaintiff's past nursing home work as: caregiver, Dictionary of Occupational Titles ("DOT") number 354.377-014, specific vocational preparation ("SVP") of 3, semi-skilled, medium per the DOT but very heavy per the claimant; and hospital housekeeper, DOT number 323.687-010, SVP of 2, unskilled, medium per the DOT and the claimant. *Id.*

The ALJ asked the VE to consider a person of Plaintiff's age, education, and with the jobs as described, with the following limitations:

> And further assume for this first hypothetical that the individual is limited to the light exertional level, occasional climbing of ramps and stairs, never climbing of ladders, ropes, or scaffolds, occasional balancing, stooping, kneeling, crouching, and crawling. No concentrated exposure to hazards, such as unprotected heights or dangerous moving machinery. No concentrated exposure to extreme cold. The individual can sustain concentration, persistence, and pace for periods of two hours at a time, with simple, routine tasks. Can have no customer-service interaction with the public, but can have frequent interaction with co-workers and supervisors. Can perform low-stress work defined as occasional decision-making and occasional changes in work setting.

Tr. 68-69. The ALJ asked if the hypothetical individual could perform either of Plaintiff's past two jobs and the VE responded in the negative. Tr. 69. The VE testified the hypothetical individual could work and identified the following light, unskilled jobs as examples: mail sorter, DOT number 222.687-022, SVP of 2, with over 80,000 nationally; photocopy-machine operator, DOT number 207.685-014, SVP of 2, with over 25,000 nationally; and inspector/hand packager, DOT number 559.687-074, SVP of 2, with over 50,000 nationally. Tr. 69-70.

The VE stated that her testimony was consistent with the DOT; however, "the DOT does not cover the difference between ramps and stairs, ladders, ropes, and scaffolds, the concentration, persistence, and pace, the supervision as you had described it." Tr. 70. The VE stated that she answered those questions based on her "professional experience, research, and education, working with employers, employees, staffing agencies, temporary agencies, as well as conducting labor market studies and doing job searching duties on a regular basis." *Id.*

For his second hypothetical the ALJ changed the exertional level from light work to sedentary work with the remaining limitations as in the first hypothetical and asked if the individual could perform other work. Tr. 70. The VE responded affirmatively and identified the following jobs at the sedentary unskilled level: final assembler, DOT number 713.687-018, SVP of 2, over 50,000 nationally; table worker, DOT number 739.687-182, SVP of 2, with over 27,000 nationally; and inspection positions, example of touch-up screener, DOT number 726.684-110, SVP of 2, with over 50,000 nationally. Tr. 70-71.

For his third hypothetical the ALJ added three more limitations to the second hypothetical of occasional handling and fingering; the need to prop legs to waist level two of eight hours while seated; and "the individual could not maintain concentration, persistence, and/or pace in two-hour blocks of time on a sustained basis without redirection." Tr. 71. The VE testified there would not be competitive employment available for that individual. *Id.*

Plaintiff's counsel asked the VE how her answer to the third hypothetical would be affected if "the person is going to miss two days per month due to their medical conditions," and the VE responded there would be no work if that were on an ongoing basis. Tr. 72.

With no other further questions, the hearing closed. Tr. 74.

II.  Discussion

A.    The ALJ's Findings

9

In his May 13, 2021 decision, the ALJ made the following findings of fact and conclusions of law:

1.    The claimant meets the insured status requirements of the Social Security Act through December 31, 2022.

2.    The claimant has not engaged in substantial gainful activity since August 30, 2017, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3.    The claimant has the following severe impairments: degenerative disc disease, chondromalacia of the left knee, obesity, affective disorder, anxiety and post-traumatic stress disorder (PTSD) (20 CFR 404.1520(c) and 416.920(c)).

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except the claimant can occasionally climb ramps and stairs, but can never climb ladders, ropes or scaffolds; she can occasionally balance, stoop, kneel, crouch and crawl; she should have no concentrated exposure to hazards, such as unprotected heights or dangerous moving machinery; she should have no concentrated exposure to extreme cold; she can sustain concentration, persistence and pace for periods of two hours at a time with simple routine tasks; she can have no customer service interaction with the public, but can have frequent interaction with coworkers and supervisors; she can perform low-stress work, defined as occasional decision making and occasional changes in work setting.

6.    The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.    The claimant was born on July 23, 1975 and was 42 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.    The claimant has a limited education (20 CFR 404.1564 and 416.964).

9.    Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a

finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569a, 416.969, and 416.969a).

11. The claimant has not been under a disability, as defined in the Social Security Act, from August 30, 2017, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

Tr. 17-18, 21, 25-27.

B. Legal Framework

1. The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are "under a disability," defined as:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]

42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 1382c(a)(3)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 461 n.2 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following: (1) whether the claimant is working; (2) whether the claimant has a severe impairment; (3) whether that impairment meets or equals an impairment included in the

Listings;[2] (4) whether such impairment prevents claimant from performing PRW; and (5) whether the impairment prevents the claimant from performing specific jobs that exist in significant numbers in the national economy. *See* 20 C.F.R. §§ 404.1520, 416.920. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis.  If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if the claimant can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, §§ 404.1520(a), (b), 416.920(a), (b); Social Security Ruling ("SSR") 82–62 (1982). The claimant bears the burden of establishing the inability to work within the meaning of the Act.  42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy.  To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence

---

[2] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. §§ 404.1525, 416.925. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, he will be found disabled without further assessment. 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that his impairments match several specific criteria or be "at least equal in severity and duration to [those] criteria." 20 C.F.R. §§ 404.1526, 416.926; *Sullivan v. Zebley*, 493 U.S. 521, 530-31 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish the inability to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981)*; see generally Bowen*, 482 U.S. at 146 n.5 (regarding burdens of proof).

### 2.     The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See Id.*, *Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls*, 296 F.3d at 290 (citing *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005); *see also Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (explaining that, "whatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high," as it means only "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion"). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings, and that the conclusion is rational. *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d

541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

## III.  Analysis

Plaintiff argues that the ALJ erred by not considering the longitudinal record and by failing to consider three serious medical conditions. Pl.'s Br. 5, ECF No. 10. The Commissioner contends that substantial evidence supports the ALJ's finding that Plaintiff was not disabled and "Plaintiff's general contention that the ALJ did not consider all her alleged impairments when assessing the RFC is unsupported." Def.'s Br. 10, ECF No. 11.

### A.    The ALJ's Residual Functional Capacity ("RFC") Determination

An RFC assessment is a determination of an individual's ability to perform sustained work-related activities on a regular and continuing basis. SSR 96-8p, 1996 WL 374184 at *1. "RFC is not the *least* an individual can do despite his or her limitations or restrictions, but the *most*." *Id.* (emphasis in original). At the administrative hearing level the ALJ is responsible for assessing a claimant's RFC. 20 C.F.R. § 404.1546(c); § 416.946. An ALJ's RFC assessment should be based on all relevant evidence and will consider the claimant's ability to meet the physical, mental, sensory, and other requirements of work. 20 C.F.R. § 404.1545(a)(3)-(4); § 416.945(a)(3)-(4).

The Administration's policy interpretation on assessing an individual's RFC emphasizes that the "RFC assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis, including the functions in paragraphs (b), (c), and (d) of 20 CFR 404.1545 and 416.945. Only after that may RFC be expressed in terms of the exertional levels of work, sedentary, light, medium, heavy, and very heavy." SSR 96-8p, 1996 WL 374184, at *1. The functions identified in the cited regulations

include physical abilities, mental abilities, and other abilities affected by impairments. 20 C.F.R. § 404.1545(b)-(d); § 416.945(b)-(d).

Here, at Step Two of the sequential evaluation process, the ALJ determined that Plaintiff had the severe impairments of degenerative disc disease, chondromalacia of the left knee, obesity, affective disorder, anxiety and PTSD. Tr. 18. The ALJ determined that because Plaintiff's right foot sprain did not meet the durational requirements and her hypertension was properly treated with medication without complications, these were non-severe impairments. *Id.* The ALJ noted that Plaintiff had alleged difficulties with fibromyalgia, but she did not provide sufficient evidence of this claim. *Id.* At Step Three the ALJ determined that Plaintiff does not have an impairment, or combination of impairments, that meets or medically equals the severity of a listed impairment. *Id.* The ALJ indicated he "specifically considered listings 1.15 (Disorders of the skeletal spine resulting in compromise of a nerve root), 1.18 (Abnormality of a major joint(s) in any extremity), 12.04 (Depressive, bipolar and related disorders), 12.06 (Anxiety and obsessive-compulsive disorders), 12.15 (Trauma- and stressor-related disorders) and SSR 19-2p (Evaluating Cases Involving Obesity) as well as any other relevant Social Security Rulings (SSRs) and finds that the evidence does not demonstrate the criteria required under the listings." *Id.* The ALJ determined that Plaintiff has the RFC to perform light work as defined in 20 CFR § 404.1567(b) and § 416.967(b) with several physical and mental limitations. Tr. 21. The ALJ noted that in making his RFC assessment he "considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 404.1529 and 416.929 and SSR 16-3p." *Id.* The ALJ also indicated that he considered the opinion evidence and prior administrative findings in accordance with the regulations. *Id.*

1.    Impairments ALJ Allegedly Failed to Discuss

Plaintiff asserts that the ALJ did not consider three serious medical conditions affecting her ability to work. Pl.'s Br. 5. These conditions include scoliosis, abscesses, and a hand condition. The Commissioner contends that "[a]s the ALJ discussed, he considered the evidence addressing all of Plaintiff's alleged physical impairments (Tr. 22-23)." Def.'s Br. 8. The Commissioner argues that "Plaintiff's general contention that the ALJ did not consider all her alleged impairments when assessing the RFC is unsupported" and "Plaintiff fails to demonstrate how further evaluation of the evidence would change the outcome of the decision[.]" *Id.* at 10.

a.   Scoliosis

Plaintiff asserts she "suffers from scoliosis; however, the word 'scoliosis', including the need for a back brace, does not appear anywhere in the ALJ's Order (Tr. 12-22)." Pl.'s Br. 5. Plaintiff cites to the provision in SSR 96-8p that the "RFC assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis, including the functions in paragraphs (b), (c), and (d) of 20 CFR 404.1545 and 416.945. Only after that may RFC be expressed in terms of the exertional levels of work, sedentary, light, medium, heavy, and very heavy." Pl.'s Br. 5-6 (quoting SSR 96-8p, 1996 WL 374184, at *1). Plaintiff cites to one record from March 2019 documenting a follow-up appointment referencing an x-ray that showed "worsening scoliosis" and recommending continued use of a back brace as needed and previously learned exercises. *Id.* at 6 (citing Ex. 6F, Tr. 772-73).

Plaintiff alleged disability based on the impairments of back injury, neck injury, numbness in leg, and blood pressure—she did not allege disability based on scoliosis. Tr. 312, Oct. 27, 2018 Disability Report-Adult form. Plaintiff did not mention scoliosis at the administrative hearing and Plaintiff has not directed the court to a diagnosis of scoliosis in the record, instead she cited to a

notation about a finding in an x-ray of a 20-degree curvature.[3] In her Brief, Plaintiff notes that "[t]his condition was briefed by counsel for Claimant (Tr. 473-484; 24E, 1-12) but, unfortunately, was not considered by the ALJ." Pl.'s Br. 5. The brief to which Plaintiff refers was sent to the Appeals Council on July 12, 2021, *after* the ALJ's decision was issued on May 13, 2021.[4] However, Plaintiff's counsel did submit a Prehearing Memorandum to the ALJ on February 26, 2021 "highlighting the salient features of the case of [Plaintiff]." Tr. 439. To argue that scoliosis was a condition that was "briefed by counsel" is not entirely accurate. On the first page of the 33-page Prehearing Memorandum, counsel indicates that Plaintiff had the severe impairments of "chronic back pain; chronic neck and shoulder pain; chronic left knee pain; chronic mental health issues; and hypertension." *Id.* On page two of the memorandum—consisting of five, single-spaced paragraphs—the second paragraph contains the sentence: "X-rays of her lumbar spine in March 2019 revealed 'increasing scoliosis convex left' [6F 332, 3/20/19]." Tr. 440. There are no other references to scoliosis in the narrative of the memorandum. A chart of the "Findings" begins on page three of the memorandum and continues for the next 30 pages. These "findings" are snippets of information cut from various medical records from May 24, 2017 through February 11, 2021 and pasted into a chart. Tr. 441-470. The last page of the memorandum is a copy of Plaintiff's ninth grade report card. Tr. 471. The only other reference to scoliosis is on page 23 of the memorandum where a chart entry indicates that Plaintiff "is a f/u for a lumbar xray which showed

---

[3] "In its early stages, the condition is 'mild scoliosis' because the curvature is less than 25 degrees. A person of any age may have 'early stage scoliosis.' Moderate curvature of the spine is if the condition progresses and the spine curve reaches 25-50 degrees. Curves measuring over 50 degrees are considered a severe curvature of the spine." *See* https://treatingscoliosis.com/moderate-and-severe-scoliosis/ (last visited Apr. 20, 2023).

[4] The Appeals Council considered Plaintiff's Representative Brief in determining that the reasons outlined in the brief did not provide a basis for changing the ALJ's decision. The Brief Plaintiff filed in this case seeking review of the Commissioner's final decision, ECF No. 10, contains the same arguments that are found in Representative Brief provided to the Appeals Council but differs from the Prehearing Memorandum submitted to the ALJ.

worsening scoliosis to the L with a 20 degree curvature." Tr. 461. The chart indicates the exhibit for this notation is "6F 113" and the date is "3/25/19." *Id.* This is the exhibit referenced in Plaintiff's Brief to the court. Pl.'s Br. 6.

Plaintiff did not allege disability based on scoliosis, the Prehearing Memorandum submitted to the ALJ did not allege scoliosis as an impairment, and neither Plaintiff nor her counsel raised the issue of scoliosis at the administrative hearing. The ALJ did not err by failing to refer to Plaintiff's scoliosis in his Decision. *See Meyer v. Colvin*, 754 F.3d 251, 256–57 (4th Cir. 2014) ("[A]n ALJ is not obliged to investigate a claim not presented at the time of the [benefits] application . . . and not offered at the hearing as a basis for disability." (internal quotation marks omitted) (some alterations in original)). Furthermore, Plaintiff has not pointed to any information in the medical record that indicates functional impairment because of scoliosis. Nonetheless, the ALJ considered Plaintiff's back impairments and placed limitations on her RFC based on her degenerative disc disease and decreased range of motion. Tr. 25.

b. Abscesses

Plaintiff asserts the ALJ erred in "not mentioning or discussing the abscesses caused by injections that [ ] resulted in her being hospitalized on multiple occasions." Pl.'s Br. 16. At the administrative hearing Plaintiff testified that on two separate occasions she got abscesses from the injection site on her buttocks. Tr. 59. She testified that she got sepsis from the first abscess and "was admitted into the emergency room, and they had to give [her] a lot of antibiotics and everything to get [her] back. They said the infection had got[ten] into [her] bloodstream." *Id.* Plaintiff testified that "the second time, it came back in the exact same spot. They actually . . . put [her] in the operating room the second time, put [her] to sleep, and went in and cut the whole area out so that it wouldn't come back." *Id.*

In his decision the ALJ referenced this testimony noting that Plaintiff "testified that she has tried injections for her back, but this led to additional complications with her being hospitalized for sepsis." Tr. 22. Accordingly, although the ALJ did not mention the word "abscess" he did consider Plaintiff's sepsis infection from the injections and her hospitalization.

Plaintiff received treatment for the abscesses, and the medical records do not indicate any lasting issues following her recovery from surgery, nor does she allege any functional limitations as a result of the abscesses. After her July 15, 2019 discharge from the hospital following the abscess surgery, Tr. 706-10, Plaintiff was contacted by a physician's assistant via telephone on July 16, 2019 and Plaintiff reported that she was "doing ok" and planned to make a follow-up appointment in ten days, Tr. 683. Plaintiff was examined by the surgeon on July 31, 2019, and Plaintiff did not report any difficulties "except for some itching around the site." Tr. 674. The surgeon indicated the wound "appear[ed] to be healing well." *Id.* At an August 28, 2019 appointment Plaintiff indicated that she was "off antibiotics and everything has healed." Tr. 667.

An impairment must last "for a continuous period of at least 12 months" to be considered disabling. 20 C.F.R. §§ 404.1509, 416.909. Plaintiff's abscesses were not disabling impairments as they did not last the requisite period. It is the claimant's burden to prove that she suffers from a medically severe impairment. *Bowen v. Yuckert*, 482 U.S. at 146 n.5. Because there is no medical evidence in the record that Plaintiff's abscesses created a functional limitation that affects her ability to work, substantial evidence supports that the condition was not a severe impairment, and any error in the ALJ's failure to discuss the condition was harmless. *Chaple v. Astrue*, No. 5:11-CV-00061-D, 2012 WL 939854, at *5–6 (E.D.N.C. Feb. 16, 2012), *report and recommendation adopted,* No. 5:11-CV-00061-D, 2012 WL 937260 (E.D.N.C. Mar. 20, 2012) (holding that the ALJ did not err in failing to discuss the claimant's bacterial infection in the RFC assessment when

there was no medical evidence in the record that supported any limitation based on the alleged impairment).

### c. Hand Condition

Plaintiff alleges she suffers from chronic bilateral hand pain for which she has received injections. Plaintiff argues the ALJ did not "mention or address" her hand condition. Pl.'s Br. 18-19.

As with the other conditions that Plaintiff alleges the ALJ failed to discuss, Plaintiff did not allege disability based on her hand condition. At the administrative hearing Plaintiff testified that she has "some arthritis" in her hands that causes problems with gripping, writing, and doing her daughter's hair. Tr. 62. Plaintiff stated that anything that puts pressure on her hands is painful. *Id.* At the administrative hearing the ALJ posed three different hypotheticals to the VE. His first hypothetical included light level work with certain physical, environmental, and mental limitations. Tr. 68-69. The VE identified three jobs that the individual could perform. Tr. 69-70. In his second hypothetical the ALJ changed the exertional level from light to sedentary work and the VE identified three jobs that could be performed. Tr. 70-71. For his third hypothetical the ALJ added three limitations to his hypothetical, including the limitation of occasional handling and fingering. Tr. 71. However, the ALJ did not include a such a limitation in his RFC assessment, Tr. 21, nor is he required to do so. While questions posed to the vocational expert must fairly set out all of the claimant's impairments, the questions need only reflect those impairments supported by the record. *Russell v. Barnhart*, 58 F. App'x 25, 30 (4th Cir. 2003) (citing *Chrupcala v. Heckler*, 829 F.2d 1269, 1276 (3d Cir. 1987)). The ALJ is not obligated to accept or rely on the VE's testimony in response to limitations that are not supported by the record. *Youkers v. Colvin*, 2014 WL 906484, at *11 (S.D. W. Va. Mar. 7, 2014); *Mickles v. Shalala,* 29 F.3d at 929 n.7 (concluding that the hypothetical presented to the VE need only include the impairments and limitations that

the ALJ finds credible). Here, in making his RFC determination, the ALJ opted for the limitations outlined in his first hypothetical.

In his discussion of the Listings the ALJ indicated that he considered Listing 1.18 (abnormality of a major joint(s) in any extremity) but determined that Plaintiff did not meet the requirements of the listing for several reasons including that she had not met the durational requirement for a limitation involving "an inability to use both upper extremities to the extent that neither can be used to independently initiate, sustain and complete work-related activities involving fine and gross movements." Tr. 19. In his discussion of Plaintiff's neck impairments the ALJ cites to some records indicating Plaintiff complaints of "tingling in upper extremities" and sometimes "tenderness and decreased range of motion" but noting that "examinations generally showed normal range of motion, normal strength, and normal grip." Tr. 23.

Plaintiff cites to several records indicating that on October 20, 2020 she received injections in her left hand, and in May, June, and August 2020 where she reported to medical providers that she was having pain in her hands bilaterally and difficulty with grip strength.[5] Pl.'s Br. 19. The report from the October 2020 hand and upper extremity exam indicated the following:

> Exam of the right hand reveals no erythema, ecchymosis or swelling noted. She has full finger range of motion and is able to make a composite fist without any triggering. She continues to have diffuse tenderness to palpation over the index through small finger A1 pulleys however the middle and ring seem to be most tender on exam today. She is tender to palpation of the thumb CMC joint and there is a little bit of crepitus with CMC grind test. She has tenderness palpation along the thenar eminence as well as the thumb proximal pulley. No triggering of the thumb on exam today. Negative carpal tunnel compression test and negative Tinel at the wrist.

> Exam of the left hand reveals no erythema, ecchymosis or swelling noted. She has full finger range of motion and is able to make a composite fist without any triggering. She has tenderness to palpation over the ring and small finger A1 pulleys and there does appear to be thickening of the A1

_____

[5] Plaintiff also cites an x-ray from May 15, 2020 that indicates her hands were normal. Pl.'s Br. 19.

> pulley when palpated on exam today. She is tender to palpation at the thumb CMC joint however no crepitus noted with CMC grind test. Negative carpal tunnel compression test and negative Tinel at the wrist. Sensation is intact light touch in all nerve distributions.

Tr. 1743. The ALJ actually cited to the same record Plaintiff cited regarding her hand injections—exhibit 18F—in noting that diagnostic testing findings "revealing normal nerve conduction study (Exhibits 18F/145)." Tr. 23. In her Brief Plaintiff indicated that "[n]o recent EMG/NCV has been conducted." Pl.'s Br. 19. However, as noted by the ALJ, the medical record dated October 20, 2020 indicates that a nerve conduction study was performed on July 28, 2020 and reviewed at the October appointment. Tr. 1743 (Exhibit 18F/145). That Progress Note indicates that it "was a normal nerve conduction study without any sign of nerve compression or cervical radiculopathy." *Id.*

ALJs are not required to specifically discuss and analyze every piece of evidence in the case in their narrative opinions so long as it is possible for the reviewing court to realize that all relevant evidence was considered, though not written about, in reaching the ultimate decision. *Phillips v. Barnhart*, 91 F. App'x 775, 780 n.7 (3d Cir. 2004) ("[T]he ALJ's mere failure to cite specific evidence does not establish that the ALJ failed to consider it."); *Black v. Apfel*, 143 F.3d 383, 386 (8th Cir. 1998) ("Although required to develop the record fully and fairly, an ALJ is not required to discuss every piece of evidence submitted."); *Dyer v. Barnhart*, 395 F.3d 1206, 1211 (11th Cir. 2005) (finding that "there is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision, so long as the ALJ's decision . . . is not a broad rejection" insufficient to enable the reviewing court to conclude that the ALJ considered the claimant's medical condition as a whole). "Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains 'sufficien[t] evidence' to support the agency's factual determinations. And whatever the meaning of 'substantial' in other contexts, the

threshold for such evidentiary sufficiency is not high." *Biestek v. Berryhill*, 139 S. Ct. at 1154

(internal citation omitted). Upon review of the ALJ's decision, the parties' arguments, and the

record, the undersigned finds that the ALJ did not err in his alleged failure to cite to certain

impairments in making his RFC determination.

        2.    ALJ's Alleged Failure to Consider Longitudinal Record Regarding
              Plaintiff's Cervical and Lumbar Impairments and Knee Condition

Plaintiff argues that the "ALJ minimizes the lumbar and cervical condition by 'cherry-

picking' facts that are not representative of the longitudinal record or the seriousness of her

conditions." Pl.'s Br. 9. Plaintiff also alleges the ALJ minimized her left knee condition and "fails

to cite numerous annotations in the medical records that support and justify [her] claims of

problems and limitations due to left knee conditions." Pl.'s Br. 10. The Commissioner contends

that the ALJ "considered the evidence addressing all of Plaintiff's alleged physical impairments

(Tr. 22-23)." Def.'s Br. 8.

Regarding her cervical and lumbar impairments Plaintiff cites to a 2017 Progress Note of

Dr. Neha Chowdary who discusses Plaintiff's back pain from a work-related injury. Pl.'s Br. 7

(citing Tr. 866, ex. 6F/206). Dr. Chowdary notes that Plaintiff had not made gains with physical

therapy and referred her for an epidural injection and a low dose of Norco.[6] *Id.* Plaintiff notes that

she ultimately received surgical intervention in August 2017. *Id.* Plaintiff cites to medical records

of x-rays and MRIs of her lumbar and cervical spine indicating disc bulges and arthropathy. Pl.'s

Br. 8-9.  Plaintiff also cites to medical records regarding her complaints of pain and treatment for

issues with her left knee. Pl.'s Br. 10-16.

---

[6] Notably, Dr. Chowdhary indicated Plaintiff could continue to work with restrictions of "no lifting, no bending or stooping and try to limit [her] to seated work if able until I see her back following the epidural injection." Tr. 866. On June 21, 2017, after reporting little relief from the injection, Dr. Chowdhary referred her for a neurosurgical evaluation, but continued Plaintiff's current work restrictions. Tr. 861.

The ALJ discussed Plaintiff's lumbar and cervical spine impairments and her knee impairments in his Decision. Tr. 22-23. In fact, the ALJ cited to many of the same records outlined by Plaintiff in her Brief that she claims the ALJ did not consider, including records documenting pain, diagnostic imaging, and various treatments including surgery. Tr. 22. For example, the ALJ noted:

> Regarding the claimant's lower back and knee impairments, the record indicates the claimant complained of 5/10 back pain that radiates down her left leg with difficulties walking, reaching and lifting (Exhibits 1F/1, 13; 2F/1-2; 4F/3, 9, 35; **7F**/13-**14**; 8F/5; 9F/1, 3; **10F**/20, **24**; 15F/49; **18F/20**, 58, 84) . . . There were also less optimal findings, including at times tenderness, decreased range of motion, no knee reflexes, mild knee crepitus, positive McMurray test and an antalgic gait (Exhibits 1F/3; **2F/2-3**, 5, 11-16; 4F/2-4, 11, 16-17, 33-34; 6F/9, 55, 68; 8F/6; 10F/10, 27; **14F/9**; 15F/23, 110; **18F/24**, 61-62, **81**, 102-103; 19F/5). Diagnostic imaging also corroborated the examination findings, revealing an L5 to S1 herniated nucleus pulposus with some L4 to L5 stenosis in 2018 and moderate L4 to S1 disc bulges in 2019, but with nerve conduction studies revealing no evidence of radiculopathy. Left knee imaging revealed effusion, lateral tilting and subluxation of the patella and chondromalacia in the lateral tibial plateau with mild degenerative changes in the patellofemoral joint (Exhibits **2F/1, 3**; 4F/9; 6F/6, 100; **10F/8**, 12, 20; 12F/7; **14F/9**, 21-23; 15F/12, 177-178; **17F/3-6**; 18F/9; 21F/1-2, 9). The claimant was prescribed medications as a result of these conditions, including Flexeril, Gabapentin and Hydrocodone (Exhibits 19E; 2F/9, 17; 4F/2, 38; 6F/5; 8F/5; 14F/9). The claimant has also tried alternative treatments, including injections, physical therapy and eventual decompression surgery from L5 to S1 in August 2017 (Exhibits 1F/1; **2F/1, 3**, 5, 14; 3F/1-9; 4F/3, 37, 42, 51-55; **6F/99**; 11F/1; **19F/16**).

*Id.* (bolded records cited by Plaintiff as not having been considered). The ALJ concluded his RFC discussion by finding his assessment was supported by treatment notes. The ALJ noted that he limited Plaintiff to "less than light exertion work, based on evidence of degenerative disc disease, [and] chondromalacia of the left knee" and limited her to "occasional balancing, stooping, kneeling, crouching, crawling and climbing ramps and stairs, but no climbing of ladders, ropes or scaffolds, based on evidence of . . . decreased range of motion, tenderness, no knee reflexes, mild knee crepitus, positive McMurray and Spurling tests and an antalgic gait." Tr. 25. He also limited Plaintiff to "no concentrated exposure to hazards or to extreme cold, based on evidence of knee

24

crepitus, antalgic gait and imaging that revealed disc bulges and mild degenerative changes in the patellofemoral joint." *Id.*

As indicated previously in this Order, an ALJ is not required to specifically discuss and analyze every piece of evidence in the case as long as it is possible for the reviewing court to realize that all relevant evidence was considered in reaching the ultimate decision. Furthermore, "Plaintiff does not offer *any* argument as to how consideration of *any* of the evidence she cites as allegedly overlooked by the ALJ would change the ALJ's RFC finding or the ALJ's ultimate finding of non-disability." *Doyle v. Kijakazi*, No. 2:21-CV-00780-MGB, 2021 WL 9583275, at *5 (D.S.C. Nov. 16, 2021) (emphasis in original). "Because the ALJ directly addressed Plaintiff's medical records, acknowledged these severe impairments, and explained with specific citations to the record why he found Plaintiff was not limited to the extent he alleged, this Court concludes the ALJ did not improperly cherry-pick the record and that his decision is supported by substantial evidence." *Hall v. Saul*, No. 1:19-CV-01637-RBH, 2020 WL 6156535, at *9 (D.S.C. Oct. 21, 2020), *aff'd sub nom. Hall v. Kijakazi*, No. 20-2356, 2022 WL 5434322 (4th Cir. Oct. 7, 2022).

### 3.     ALJ's Consideration of Plaintiff's Mental Health Issues

In her final argument Plaintiff contends the ALJ minimized her "significant mental health issues" and the ALJ did not properly consider the opinion of Dr. Bruce Kofoed that Plaintiff alleges would preclude any employment. Pl.'s Br. 17-18. The Commissioner argues the ALJ included limitations in the RFC to address Plaintiff's mental impairments and that his RFC assessment is supported by the treatment notes and opinion evidence. Def.'s Br. 8-10.

The ALJ determined that Plaintiff had the severe mental impairments of affective disorder, anxiety, and PTSD. Tr. 18. At Step Three of his Decision, the ALJ determined the severity of Plaintiff's mental impairments did not meet or medically equal the Paragraph "B" criteria of Listings 12.04, 12.06, and 12.15. Tr. 20. The listings for mental disorders are arranged in 11

categories: Neurocognitive disorders (12.02); schizophrenia spectrum and other psychotic disorders (12.03); depressive, bipolar and related disorders (12.04); intellectual disorder (12.05); anxiety and obsessive-compulsive disorders (12.06); somatic symptom and related disorders (12.07); personality and impulse-control disorders (12.08); autism spectrum disorder (12.10); neurodevelopmental disorders (12.11); eating disorders (12.13); and trauma- and stressor-related disorders (12.15). Paragraph B of each listing (except 12.05)[7] provides the functional criteria to be assessed, in conjunction with a rating scale (*see* 12.00E and 12.00F), to evaluate how a claimant's mental disorder limits functioning. These criteria represent the areas of mental functioning a person uses in a work setting. 20 C.F.R. Pt. 404, Subpt. P, App. 1, Section 12.00(A)(1) and (2)(b).

The ALJ found Plaintiff had moderate limitations in the area of understanding, remembering, or applying information and noted Plaintiff's testimony that she had a ninth-grade education and was unable to pass the testing for a GED. Tr. 20. The ALJ cited to treatment notes; he also cited to Dr. Kofoed's mental consultation examination indicating Plaintiff "had difficulties with basic math and memory with him estimating a borderline intellect (Exhibit 9F/2-3)." *Id.* The ALJ determined Plaintiff had moderate limitations in interacting with others. He cited to Plaintiff's testimony, treatment notes, and to Dr. Kofoed's indication that Plaintiff was "tearful, withdrawn and anxious, but with reports of close friendships and a conclusion of moderate impairments in social functioning (Exhibit 9F/1-3)." *Id.* Citing to Plaintiff's testimony and to various treatment notes, the ALJ found Plaintiff had moderate limitations in the functional area of concentrating, persisting, or maintaining pace. *Id.* In the last area of functioning, the ALJ found Plaintiff had a moderate limitation in adapting or managing herself. *Id.* The ALJ cited to Plaintiff's testimony, to treatment notes, and to Dr. Kofoed's examination notation that Plaintiff "was properly groomed,

---

[7] The Paragraph B requirements for Listing 12.05 include a finding of significantly subaverage general intellectual functioning *and* significant deficits in adaptive functioning.

but with indications of only bathing once a week and limited house chores with poor stress tolerance and moderate limits in activities of daily living (Exhibit 9F/2-3)." *Id.*

In his discussion of Plaintiff's RFC the ALJ discussed Plaintiff's mental health impairments and records that showed both positive and negative findings. Tr. 23. The ALJ also discussed the opinion of the State agency mental consultant, Dr. Catherine Blusiewicz, but found her work limitations to be inconsistent with Dr. Kofoed's opinion. Tr. 24. The ALJ discussed Dr. Kofoed's opinion in detail noting that at the time of the consultative examination Plaintiff "was struggling with a divorce from her long time spouse and had a period of inpatient mental admission followed by an intensive outpatient program." *Id.* The ALJ made the following finding:

> The undersigned does not find Dr. Kofoed's opinion persuasive because his exam was conducted during the period shortly after the inpatient admission and when the claimant was still going through the intensive outpatient treatment. It probably is supported and consistent for that period of time but not over the period of time at issue as a whole and not for periods of time over 12 months. The discharge summary from the intensive outpatient program dated February 10, 2020 indicates the claimants anxiety and depression were "better with treatment," further noting "[s]ignificant residual symptoms are mild," with the mental status exam noting "mood is 'pretty good,'" "linear, coherent, goal- directed, intact associations," grossly intact memory, "[g]ood concentration and attention, good abstraction, adequate fund of information and average intelligence," along with intact impulse control, good insight, and adequate judgement (Exhibit 13F/83).

*Id.* In his conclusion the ALJ noted that his RFC assessment was supported by the treatment notes and that his limitation to less that light exertion work was based on evidence including Plaintiff's affective disorder, anxiety, and PTSD. Tr. 25. The ALJ addressed specifically Plaintiff's mental limitations in his conclusion:

> As to her mental limitations, the claimant was limited to sustaining concentration, persistence and pace for periods of two hours at a time with simple routine tasks, based on evidence of impaired memory and recall at times, but with adequate attention and concentration also noted. The claimant was limited to no customer service interaction with the public, but frequent interaction with coworkers and supervisors, based on evidence she at times appeared depressed, tearful, nervous and anxious with a flat/constricted affect, but was generally noted as pleasant and cooperative with a normal mood and normal affect. The claimant was limited to

performing low-stress work, based on evidence of poor stress tolerance and limited insight at times, but with her also generally noted with normal behavior, good insight and good judgment. Accordingly, the undersigned finds that the residual functional capacity is consistent with the evidence.

*Id.*

Here, the ALJ appropriately considered records that supported some mental limitations, and he explained why he found Plaintiff's mental health limitations were not disabling. "[A] psychological disorder is not necessarily disabling. There must be a showing of related functional loss." *Gross v. Heckler*, 785 F.2d at 1166 (citing *Sitar v. Schweiker,* 671 F.2d 19, 20–21 (1st Cir. 1982)). The ALJ provided the proper consideration of Dr. Kofoed's opinion and explained why he found it to be unpersuasive. The court finds that Plaintiff's contention that the ALJ minimized her mental health issues to be without merit.

The ALJ has the duty to weigh the evidence, resolve material conflicts in the record, and decide the case accordingly. *See Richardson v. Perales*, 402 U.S. at 399. The ALJ met his statutory and regulatory obligation to assess all of the evidence in the record. This court may not reweigh the evidence or substitute its own judgment for the Commissioner's, even if it finds the evidence is susceptible to more than one rational interpretation. *See Hays*, 907 F.2d at 1456. The ALJ's analysis of the evidence provides a logical bridge between the evidence and his RFC findings. *Bennett v. Astrue*, No. 1:10-CV-1931-RMG, 2011 WL 2470070, at *3 (finding the ALJ's RFC assessment consistent with the regulations and "that the ALJ's opinion sufficiently explained how he determined Plaintiff's RFC . . . ."). Therefore, the court finds that the ALJ did not fail to assess Plaintiff's RFC to such an extent that it would require remand.

IV.    Conclusion

The court's function is not to substitute its own judgment for that of the ALJ, but to determine whether the ALJ's decision is supported by substantial evidence. Based on the

foregoing, the undersigned finds that Plaintiff has not shown that the Commissioner's decision was unsupported by substantial evidence or reached through application of an incorrect legal standard. *See Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996); *see also* 42 U.S.C. § 405(g). Therefore, the Commissioner's decision is affirmed.

IT IS SO ORDERED.

April 20, 2023                                    Kaymani D. West
Florence, South Carolina                 United States Magistrate Judge